# EXHIBIT 4

ARBITRATION OPINION AND AWARD

+++++++++++++++++++++++++++++
|  | In the matter of Arbitration | + | Grievance of Nick Hassard |
|  | between | + | Hearing Date: December 6, 2017 |
|  | Proctor and Gamble, Mfg. Co. | + | Briefs Received: February 14, 2018 |
|  | and | + | Award Date: April 17, 2018 |
|  | Association of Employees | + |  |
|  | of the St. Louis Plant | + |  |
+++++++++++++++++++++++++++++

Before:
Josef Rohlik, neutral arbitrator
Marianne Dressman and Michael Reilman,
    Arbitrators appointed by the Parties

Appearances:
For the Company: Michael Aldana, Esq.
For the Union: David O'Brien Suetholz, Esq.

BACKGROUND

This grievance comes from the Line 29 Case Packer of the Proctor and Gamble
manufacturing facility in St. Louis, Missouri (hereinafter referred to as the Company). The
Union protests the discharge of Mr. Nick Hassard as being without just cause, in violation of the
June 13, 2017 Agreement of the Parties (Jt. E 1).

The arbitration hearing was held in Clayton, Missouri. The Parties waived the time limit
of Section 3 of Article XIV, on the time limit for the issue of the award.

At the time of his discharge on July 27, 2017, the Grievant was a technician with 2005
seniority. He was discharged for a violation of the Lockout/Tagout Policy (LOTO) (Jt. E 2). A

brief description of the violation will appear below in connection with the discussion of the Grievant's testimony.

The Grievant and the Union have admitted the LOTO violation at the hearing.  The only issue thus is the propriety of the penalty.

Safe Practice (Jt. E 5, 6) reads in part:

## V. SITE SAFE PRACTICES – RELEVANT COMPANY POLICIES (JT. EXH. 6)

1) **P&G SAFETY VALUES**
   **P. 3:**

   At Proctor & Gamble, safety is a core value in how we operate.  The company places a very high value on the Health and Safety of its employees and is guided by the following Values:
   - Nothing we do is worth getting hurt
   - Health, Safety & Environment can be managed
   - Every incident could and should have been prevented
   - Health, Safety & Environment is everyone's responsibility

2) **CRITICAL BEHAVIORS**
   **P. 6:**

   St. Louis Critical Behaviors: Any violation of safe practices could lead to removal from site and/or discipline.
   - The following 5 safe practices are designated as "Life Saving Behaviors", because if violated they could lead to serious injury or death.
   - *If the following 5 safe practices are violated it may lead to escalated disciplinary follow-ups.*

   **P. 7:**

   We have moved to **WIPPL:**

   **W- Work**
   **I – Incidents**
   **P – PPE**
   **P – Permits**
   **L – LOTO**

   **P. 11:**

2

**L – LOTO!** *Always follow all ISOLATION OF HAZARDOUS ENERGY requirements:*
- Do not break the plane of moving or energized equipment
- *Follow lockout and isolation procedures* (this includes placing lock on the Minor Servicing Latch) *for equipment before clearing jams, cleaning, or maintenance/repair.*
. . .
- Never nullify, modify, or bypass a plant safety device such as a guard, disconnect, fuse, circuit breaker, relief device, interlock, or elevator gate interlock.

3) **YOUR CONDUCT**
   **P. 23:**
   - Comply with all safety signs and safe practices.
   - Safety is everyone's responsibility – discuss all at-risk behaviors you observe.
   - It is your responsibility to ensure all safety inspections have been completed in your area of your work. If you own a safety inspection system, you must comply with the inspection frequency and requirements.

   **P. 24:**
   If you feel you cannot perform your work duties safely for any reason, please inform your TL or SFL immediately.

4) **OPERATING EQUIPMENT SAFE PRACTICES**
   **Lock Out Safely (p. 57)**
   - Never reach into equipment without following the Isolation of hazardous energy procedure.
   - *ALL individuals working on a piece of equipment MUST have their personal locks on all of the sources of energy* and **MUST** have the key(s) to these lock(s) on their person.

VI. **PROGRESSIVE DISCIPLINE SYSTEM – RELEVANT COMPANY POLICY POLICIES (CO. EXH. 8)**

1) **INTENT**
   *The discipline system is progressive in nature and looks at an individual's total performance, including work performance, conduct and attendance.* Work performance includes quality of work, productivity, team work, safety, decision making effectiveness, working to improve cost. Conduct includes the expectations outlined in the employee handbook.

2) **PRINCIPLES**
   When a situation of inappropriate behavior occurs that may require discipline, it is the manager's responsibility to confront the individuals involved. The process begins with determining what happened through a thorough investigation of the facts. *An individual's past history that establishes a*

3

*pattern, as well as the severity of the offense should be considered.* Major offenses (for example, violation of the employee standards) and unsatisfactory performance may result in different (including skipping steps) discipline depending on the employee's history and the nature of the offense.

. . .

If an offense in sufficiently severe, employment may be terminated in the first instance, regardless of length of service or prior work record.

**3) PROGRESSIVE DISCIPLINE STEPS**

| STEPS | IMPACT: |
|---|---|
| 1.  Oral reminder | Note in File;<br>No promotions, transfers or roles for 6 months |
| 2.  Written reminder | Note in File;<br>No promotions, transfers or roles for 9 months |
| 3.  Decision Making Leave | Note in File;<br>No promotions, transfers or roles for 12 months |
| 4.  Termination | |

**4) DEACTIVATION**
Deactivation means the discipline does not count against promotion, transfers or off line roles.

**VII. ISOLATION OF HAZARDOUS ENERGY – LOCKOUT (CO. EXH. 11)**

**1) WHEN DOES LOCKOUT APPLY?**
**P. 3:**
*100% Lock Out 100% of the time*
**2) LOCKOUT RULES**
**P. 5**
***Each person applies their own lock!!!***

The Company brief contains a description of the Grievant's disciplinary history (at 12-14):

[. . .] The grievant's first major safety infraction occurred on May 26, 2011 when he crossed the barrier guard of an energized piece of equipment in the St. Louis facility's Line 20 filler area.  Given the seriousness of the lockout/tagout violation, the Company placed the grievant in Step 2 of the progressive discipline system and issued him a written warning the next day.  Co. Exh. 15.  In order to prevent

4

Case: 4:18-cv-01026-NCC   Doc. #:  1-4   Filed: 06/25/18   Page: 6 of 17 PageID #: 379

recurrence, the Company reminded the grievant that the lockout/tagout procedure is considered site-critical behavior and that any further issues may lead to additional disciplinary action. *Id.* Notably, the Union did not grieve the fact that the Company had moved 2 steps – from 0 to 2 – for this infraction.

Just three months later on August 30, 2011, the grievant was placed in Step 3 of the progressive discipline system and put on "Decision Making Leave" after then-Cascade Line Leader Brian Todd observed the grievant on two separate occasions performing tasks without wearing the necessary personal protective equipment ("PPE") Co. Exh. 16. The Company again warned the grievant that he was required to follow all safe practices, including wearing the appropriate PPE and following the lockout/tagout procedure, and that any future issues could result in further disciplinary action, up to and including termination. *Id.*

On April 16, 2014, the grievant committed a second lockout/tagout violation which was startlingly similar to his first.   Specifically, then-Cascade Operations Department Leader Lindsay Spahr witnessed the grievant deliberately cross the barrier guard and pull a carton out of the St. Louis facility's Line 20 Filler. Co Exh. 14. After Spahr confronted the grievant and asked him if he indeed broke the plane, he stated, "Yes, I think I got too close." *Id.* The grievant then proceeded to state that he would be fired if Spahr charged him with the violation and that he "promises to never do it again." *Id.* Thereafter, Spahr conducted a fact-finding with the grievant during which he recanted his previous admission, but also maintained that he was worried he would be fired for the safety violation because it is unheard of not to be fired for two lockout/tagout violations. *Id.* Spahr confirmed in subsequent fact-findings with the grievant's teammate John Heyen and team leader Mike Carlton that it is impossible to remove a carton from the Line 20 Filler without crossing the barrier guard. *Id.*

After reviewing the grievant's disciplinary record, which included a previous lockout/tagout violation, Spahr notified Union President David Wirth that she had serious concerns regarding whether the grievant's behavior could be rehabilitated given his inability to internalize P&G's safety requirements.  Tr. Pp. 131-132. Spahr accordingly informed Wirth that she was considering discharging the grievant. *Id.* Wirth disagreed, however, and pushed back that the grievant's second lockout/tagout violation deserved some lesser punishment than discharge. *Id.* At 132-133.   The Company ultimately offered the grievant one more chance to improve his behavior and decided to place him on Decision Making Leave coupled with a Performance Improvement Plan ("PIP") for the serious infraction. Co. Exh. 14.   The Company further cautioned the grievant the "there will be no additional chances . . . with Red-Light Behavior violations.  Any additional violations will result in termination." *Id.* Both the grievant and Wirth acknowledged the discipline in writing. *Id.* Importantly for this case, the Union never filed a grievance concerning the April 2014 discipline, nor did it raise any objections regarding the Company's discretion to move to the third step in the progressive discipline system, building on discipline from three years earlier.  Tr. Pp. 220-221.

Two months later on June 4, 2014, Spahr held a formal coaching session in follow up to the grievant's Performance Improvement Plant after she witnessed him running across the packing floor. Co. Exh. 17.  The documented coaching session

5

reiterated the Company's warning that it would not tolerate any additional Red-Light Behavior violation from the grievant, and that any additional violations would result in termination. *Id.*

There is no expungement of discipline provision in the Agreement.  There is a provision in the site practices that reads as noted above, that "deactivation means the discipline does not count against promotion, transfers or off line roles".

The decision to discharge is effectively a collective management decision.  Lindsay Spahr, Cascade Operations Leader, appeared in the arbitration hearing to have the key role in the decision to discharge the Grievant.  She is responsible for the operations of the equipment and the personnel of the Cascade in St. Louis.  During her testimony, the Parties stipulated that the Grievant was well-trained in LOTO procedures and knew the equipment that required LOTO.

When Spahr found from the Grievant's supervisor Foust of the Grievant's violation of the LOTO procedures in July 2017, she called HR.  she asked Foust to write a statement and ask the line leader Kevin Wilberding to complete the fact finding and get a Union officer involved. There is no claim of any failure to involve the Union and observe its rights.

Spahr discussed her 2014 note to the Grievant that any additional violations would lead to the Grievant's termination with the Union President David Wirth.  Spahr testified that she was worried that the Grievant would not change (Tr. 132).  She testified that Wirth never told her termination of employment was not allowed in such a case under progressive discipline (Tr. 133).  She pointed out that there was no grievance to the 2014 discipline or any of the collateral decisions or subsequent coaching.

Spahr testified about her thinking process concerning the 2017 discipline:

A. My biggest concern once we had all the facts form the July incident is that we have had two previous lockout/tagout violation, and now a third, and we have tried the highest level of discipline to try and change Nick's behavior and we have not been able to change his mind set that his personal safety is more

6

important than getting cases out the door so I have no other way to ensure that his safety will come to mind when he decides to violate another safe practice, which could put himself or anybody else at risk.

Q.   Can you briefly describe what your philosophy is on discipline, what's the purpose of discipline?

A.   One of the primary purposed of discipline is to change behavior.  We administer so we can change behavior, it's not punitive, it's to change behavior.  And we've tried it repeatedly, I mean my lap is full of documents with us trying to change Nick's behavior with discipline and we were unable to do that.

Q.   So what was your thinking then, what was your concern about giving Nick another chance.

A.   Without being able to change his behavior there's no way that I could sleep at night knowing he's at the site and is potentially violating any red light behavior again and/or teaching any of the other people that work with him, especially with him being in a T4 role, he has capabilities in others as a leader on a team.  Someone that is in a capability building role if they are teaching others that safety's not important he's putting many people at risk.

Q.   And in the T4 role can you describe how he's modeling behavior?

A.   Can you clarify that question?

Q.   Well, you just said that you're concerned about the impact that he would have on T3s or other employees.  So can you describe how they would be in that situation where they'd observe Mr. Hassard potentially violating well established protocols?

A.   Yes.  So a well-established leader, all equipment owners on the floor have to interact with equipment every day.  We have steps, everyone has to lock out and get in equipment.  But when we have a T4 technical capability leader which is the role that's Nick in he's the person standing next to them and building capability in certain breakdowns in defect fixing and so if he's next to someone and doesn't value safety enough to lock out he has the potential of teaching them the same habits which is dangerous.

(Tr. 136-138)

Spahr testified that in no document is there a rule that discipline is expunged or may not be considered after a certain time (Tr. 141).

In response to the arbitrator's questions Spahr agreed that ultimately the discipline is a matter of judgment (Tr. 173).

Evert Nicholson, a mechanic, testified that the Grievant was a hard worker and was telling everybody "make sure you put your locks on the equipment" (Tr. 179).  He testified that the Grievant was really referring to his year-long performance improvement plan (Tr. 180).

David Wirth is the President of the Union, and has been in that position for twenty years.

He has worked for the Company for thirty-two years.  Wirth testified:

> Q.  All right.  Let's get straight to the main issue here.  You heard the company's witnesses describe the progressive disciplinary policy here.  Do you recognize the policy they described?
> A.  I do not.  Kind of floored by the explanation that I've heard today.  I've been involved with this for many, many years and had several discussions with the company throughout those years and it's, you know, it used to be called positive discipline system, it used to be nine months, 15 months and 24 months, the activation period for the three steps.  We used to use positive contacts when people did good things, we used formal coaching that was not considered active discipline.  We used informal coaching so that's what w, you know, in my first about 15 years here, actually longer than that, probably my first half of my career, year, 15, 17 years here that's the policy we lived under.  We negotiated with HR, you know, roughly around 2004, 2005, we negotiated those time limits as activation periods down to six, nine, and 12 months.  We quit calling it positive discipline because we said there's nothing positive about discipline.  We, you know, used to pay somebody for their suspension day off and we said that doesn't make any sense, if somebody deserves a DML we're going to not pay them.  So those are some of the changes that we made along the way.
> Q.  When you say we is that the management and the union making that decision together?
> A.  Yes, correct.  Through talks with HR we worked through this and agreed upon changes to the policy.                    (Tr. 186, 187)

Wirth further testified that these and other conditions have been discussed in management-union

meetings (Tr. 180).  The Union introduced into evidence minutes of May 26, 2016 meeting.

Point 9 reads (U E 2):

> The union requested the company to look into LOTO violations on Category 3 and understanding the standards across the company and plant for Category 3.  The current standard is that a full geography (department, area) must all be Category 3 before the standards will be changed for that area.  The current AMEC standard is that until the entire site is AMEC capable all equipment will be required to have latches.  Brian will share a copy of the standard with David and Art.  The union asked for common sense in confronting and discipline for blatant LOTO violations and just a slight break of the plane to point at something.  The company shared that this is a good discussion for DLTs and that the standards should be the same for managers, online technicians, and offline resources.  The union will review the list of open AMEC equipment and work the company to masterplan how to tackle getting existing equipment capable. (**Closed**)

8

The Union also introduced its Exhibit 3 on LOTO violation by Greg Gotsch on February

14, 2017 issued by manager Ross McLeod.  It reads in part:

Situation:

4) Greg was informed that he would receive a Written Reminder (Discipline Level 2), which places him in probation for 9 months from the date of the outage which will end discipline November 14, 2017 (No promotions, transfers or roles for 9 months).
5) Greg acknowledges that he understands that any further outages may result in further discipline up to and including termination.
6) This report will be placed it Greg's Personnel File.

The next Exhibit (3A) evidences a prior discipline of Gotsch – a "Written Reminder" –

for "not following LOTO procedures" on December 21, 2015.  That discipline is a "Written

Reminder".  It reads in part:

**Purpose:**
Effective December 21, 2015, Greg Gotsch is given two steps in progressive discipline system, resulting in a Written Reminder for not following LOTO procedures.  The discipline will be in effect until September 21, 2016.  Any time spent away from work in excess of 12 weeks for Disability or FMLA does not count toward this Written Reminder.

And, on August 18, 2015, Gotsch received "Formal Coaching for not completing the

CILs" (Exhibit 3B).

Union Exhibit 4 evidences discipline of Mark Gentry.  It reads in part:

Effective December 30, 2010 Mark Gentry was given a Written Reminder (2nd step in positive discipline system) for not following LOTO procedures.  The Written Reminder will be effective until September 30th, 2011.  Any time spent away from work for Disability or FMLA does not count toward this Oral Reminder.

Likewise, Union Exhibit 5 reads in part:

Effective March 16th, 2016, Chris Crosby was given a Decision Making Leave (3rd Step in the Positive Discipline System) for not meeting expectations as he was found in violation of the St. Louis Plant's Lock Out/Tag Out policy.  Previously, Chris was given an Oral Reminder for not meeting expectations in performing line quality tasks per expectations as a Cascade Packing Line Technician.  This discipline will remain in effect until March 16th, 2017.

9

Wirth opined that the exhibits prove that progressive discipline has always been administered. He testified that since he has been with the Company nobody was terminated for those violations (Tr. 201).

Wirth also testified that the Union discovered that there was a manager who had at least 3 LOTO violations. The Union requested his file, but the request was denied by the Company (Tr. 203).

Union Exhibit 4 evidences a "Written Reminder (2nd step in positive discipline system) for not follow LOTO procedures" on December 30, 2010 given to Mark Gentry, which was "effective until September 30, 2011".

In connection with Wirth's testimony, the Company pointed at its Exhibit 17, Lindsay Spahr's note to the Grievant which reads in part:

3) On June 4, 2014, I witnessed Nick running across the floor to get to keep his line running. I confronted the behavior, and Nick apologized.
4) Therefore I am giving Nick Formal Coaching.
5) **His behavior must change immediately, or he is at jeopardy of not passing his PIP**
6) It is important to note, that there will be no additional chances for Nick with Red-Light Behavior violations. Any additional violations will result in termination.
7) This report will be placed in employee's Personnel File.

The Grievant received various commendations during his time with the Company. On March 15, 2017, he received a Company congratulation for being awarded "TR4 Promotion Opportunity" of Technical Capability Leader (U E 6).

There was the following exchange between the Grievant and the arbitrator concerning the Grievant's LOTO violation, which resulted in his discharge:

A. Evert, he's funny. He just said look at this, I think I found it. And that's when I went to look at it, the doors were all up on it and all open, he was in the back corner of it, as he testified, and I just walked up to the front of the door and

10

that's when I looked in there, and it ain't like I was leaning on my whole body in the machine. I was, where I was at was only a foot in the machine, you know, so, but I realized it and backed out.

ARBITRATOR ROHLIK: You were bending into the machine?

A.  I kind of walk up, it's probably this, (indicating).

ARBITRATOR ROHLIK: Yes.

A.  Probably up here. And the sprocket was probably a foot and a half in front of me, and I'm going to the major distance, it's probably a foot. I don't know. There's two sprockets there.

Q. (BY MR. SUETHOLZ)  You can stand up and show Arbitrator Rohlik essentially what you did if you want.

A.  Well, I don't have the machine here.

Q.  You want to act like the end of the table is the machine?

ARBITRATOR ROHLIK: You were bending into the machine?

A.  Yeah. I was just leaning in it, you know. The whole door was open so anybody walking five feet outside the line would be technically under the door I guess.

ARBITRATOR ROHLIK: So I guess it was like looking through the window.

A.  The door was open.

ARBITRATOR ROHLIK: Yeah. So like looking through the door?

A.  I was reaching in at that sprocket.

ARBITRATOR ROHLIK: But your feet were not inside.

A.  No.

(Tr. 247-249)

The Grievant followed the proper LOTO procedure as required at the beginning of his work on the machine. He was interrupted by somebody who needed help and the Grievant left to help. When he returned he failed to follow the LOTO procedure and used a hammer, reaching at the sprocket behind the door.

The Grievant testified about his stress:

Q. Okay. Nick, I don't really want to dwell on this issue but just briefly what was the other stressor, major stressor in your life when you were coming to work?

A. My daughter.

Q. Okay. What were you going through?

A. She was addicted to heroin and I was trying to deal with that at home and got her in a rehab in Chicago, this is all right after I talked to you, around that time, and then just dealing with all that. It's a hard thing. But she ended up passing away after I was gone, so.

Q. Why did you go and talk to LeAnn?

A. It was a lot of stress and I was trying to look at the ways that I could get time off work. LeAnn told me if I got the right paperwork and everything I could take

11

off and I was kind of in the process trying to do that but I was also trying to cover, I don't know, I was trying to do too much.

(Tr. 250-251)

The Company was aware of his problems (Tr. 233).

The Company claims that it had just cause to discharge the Grievant.  The Company claims that the discharge complied with the Dougherty's seven tests.

The Company claims that it gave the Grievant substantial warning of discharge, that it conducted fair investigations, that it did not discriminate against the Grievant, that his LOTO violation was a serious offense and was repeated, that there is no contractual expiration of discipline and that work history is expressly allowed for consideration.

The Company points out that the Grievant received substantial training and in fact explicitly agreed that he could be discharged.

The Company claims that his unfortunate stress was not known by the Company prior to his violation.

The Company claims that the penalty of discharge was proper in this case, and that the arbitrator should not be allowed to overturn the Company judgment.  The Company emphasizes its concern for safety and prays that the grievance be denied.  The Company cited various published awards in support of its claims.

The Union claims that the company lacked just cause for the Grievant's discipline and emphasizes that they vigorously disagree on the Company discipline in this case.

The Union claims that the Grievant was discriminated against because he did not get the training which others got and that he was disciplined differently that other employees.  The Union claims that discipline expires in twelve months.

The Union claims that the Grievant was discriminated against because a managerial employer was not discharged after three LOTO violations.

The Union points out that arbitrators have authority to modify discipline.

The Union further claims that the Company failed to prove the progressive discipline, and that its claim that discipline is never expunged is manifestly wrong because the Parties never bargained for the progressive discipline, and because the precedents dispute the Company's interpretation.  The Union also claims that the Company failed to consider the Grievant's substantial seniority and his undeniable stress.

The Union also claims that the Grievant substantially changed after his second LOTO discipline.

The Union prays that the grievance be sustained, the Grievant be reinstated and made whole.

<u>FINDINGS</u>

1. This is a very difficult case.  On the one hand several factors must be considered. There is no doubt whatsoever that the Grievant knew very well LOTO procedures and the consequences of their violations.  He twice stated that he knew that he might be discharged in connection with his second and third violations.  The Grievant was specifically warned that a further violation may result in discharge (Co E 17, *supra*).  The Union claims of inadequate training and the lack of notice must be dismissed.  The four progressive discipline steps are clearly stated in the Company Rules (*supra*).  It is also specifically stated that LOTO violations "any lead to escalated disciplinary follow-ups" (*supra*), "if an offense is sufficiently severe, employment may be terminated in the first instance" (*supra*).  The Union claim that there was a violation of progressive discipline and its position that the progressive discipline was not

13

negotiated must be also dismissed.  The arbitration practice is unanimous that an employer may

promulgate some rules, including reasonable progressive disciplinary rules.  The arbitrator finds

that such provisions in this case are reasonable.  Finally, there is no agreement on expungement

of discipline.  There is a specific provision in the Company Rules that "deactivation means the

discipline does not count against promotion, transfers or off line roles" (*supra*).  There is a

statement in Union Exhibit 3 that end of promotion "will end discipline on . . . (no promotions,

transfers or roles for 9 months)", "the discipline will be in effect on . . .)" in Exhibit 3A, "the

Written Reminder will be in effect until . . ." in Exhibit 4, and "the discipline will remain in

effect until . . ." in Exhibit 5.  The arbitrator will return to these exhibits below.  However, the

arbitrator finds that the Union failed to prove any binding expungement of offenses.  Finally, it

must be pointed out that the Company carefully investigated this case.  "An individual's past

history that establishes a pattern, as well as severity of the offense should be considered" states

the Company Rules.  As Spahr testified, the Company considered these factors.  The arbitrator

finds that a LOTO violation is a very serious offense.  For all these reasons, the arbitrator must

conclude that <u>the Company did not abuse its discretion as a matter of violation of the Agreement,</u>

<u>its Rules, and the practice of the Parties.</u>  It may be added that the Union failed to establish any

discrimination.  Certainly, managerial employees are outside of the rules governing Company-

Union relations.

2.  On the other hand, there are some factors which are worthy of consideration.  The

Grievant did not commit any offense for three years.  The reference to discipline "in effect for . .

." in Union Exhibits 3A through 5 without the qualification of "no promotions, transfers or roles"

in Union Exhibit 3 may lead to reliance of expiration of time despite the explicit provision in the

Company rules.  Without so deciding, the arbitrator cold be so persuaded in case of the first

14

LOTO violation.  However, both under the evidence herein and the rule of reason it <u>cannot</u> be concluded that the Company could not decide to discharge the Grievant after the third LOTO violation.  However, under the Union/Management minutes point 9 (Union Exhibit 2) the company is "asked for common sense in confronting and discipline for blatant LOTO violations and just a slight break".  In this case the Grievant did not really enter the equipment.  He just leaned through the door.  It was a violation, but a minimal one and there was no danger of injury.  Furthermore, the testimony that the Grievant warned other employees not to violate LOTO, and was a good employee, was not disputed.  He was promoted after the second violation.

       3.  Ordinarily, the finding that the Company did not abuse its discretion must lead to the denial of the grievance.  Nevertheless, sometimes arbitrators decide that they found that despite a serious violation, a grievant was found to remain a good and productive employee, and return him or her to work without back pay or other benefits.  This has been accepted by courts, including the Supreme Court of the United States.  This arbitrator, in forty years of arbitration practice encompassing over two thousand cases has done it three times, and this case is the fourth one.  Spahr admitted that the decision was a discretionary one.  This arbitrator reached a different decision based on the factors noted previously in Finding #2 and in his view that the Grievant must have been devasted by the death of his daughter, which this arbitrator thinks might cloud the thinking of almost anyone.  Consequently, the grievance is partly sustained; the Grievant shall be returned to work without back pay or other benefits.

<u>AWARD</u>

The grievance is in part sustained.  The Grievant shall be returned to work without back

pay or other benefits.

Respectfully submitted,

Josef Rohlik, impartial arbitrator

In Clayton, Missouri
April 17, 2018

M. Dressman - Dissent
Marianne Dressman, Company arbitrator
6/12/2018

_____
Michael Reilman, Union arbitrator

16